# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD ALLEN NUGENT,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 08 CV 2459** |
| **v.** | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Richard Nugent seeks judicial review of a final decision denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.[1] The parties submitted cross-motions for summary judgment. Plaintiff seeks an order reversing the final determination of the Commissioner or a remand for further proceedings. The Commissioner requests that the Court affirm the ALJ's decision. The only issue before us is the disability period between October 2, 2004 to March 6, 2007[2] because, after plaintiff was denied benefits for that first application, he re-filed for DIB and the Commissioner then determined Mr. Nugent disabled. For the reasons set forth below, Plaintiff's motion is granted [dkt. 21] and the Commissioner's motion is denied [dkt. 28].

---

[1] 42 U.S.C. § 405 (g).
[2] R. 328.

1

PROCEDURAL HISTORY

Mr. Nugent filed his first application for DIB on November 17, 2004, alleging that the onset date for his disability was October 2, 2004, his last date of employment.[3] The Social Security Administration denied his claim initially and upon reconsideration on August 15, 2006.[4] Mr. Nugent then filed a timely request for a hearing on August 29, 2006, which took place on January 17, 2007.[5] John K. Kraybill, an Administrative Law Judge ("ALJ"), presided over the hearing and, on March 23, 2007, ruled that Mr. Nugent was not disabled within the meaning of the Social Security Act.[6] The ALJ's denial is the final decision with respect to the period of October 4, 2004 to March 6, 2007, and only that decision is before this Court. After the March 23, 2007 decision, Mr. Nugent reapplied for disability. On September 28, 2007, the Social Security Administration found him disabled but was unable to award benefits that pre-dated the March 23, 2007 denial.[7] So his disability period began March 7, 2007.[8]

FACTS

Richard Allen Nugent, born August 10, 1959[9], received his GED in 1977 at the age of eighteen.[10] Five years later, in 1982, he began working at what was then his parents' trailer park in Sandwich, Illinois, overseeing contractors and also performing maintenance, carpentry, and concrete work, a job that he maintained for eleven years.[11] He left that job to pursue his own business

---

[3]R.16.
[4]*Id.*
[5]*Id.*
[6]R. 22.
[7]R. 328.
[8]*Id.*
[9]R. 29.
[10]R. 128.
[11]R. 115, 117, 343.

venture, a bowling alley and bar, which he owned and operated in Wisconsin for another ten years until October of 2003, when Mr. Nugent closed the bowling alley for financial reasons.[12] It was during this time period (sometime in 1998) that Mr. Nugent was diagnosed with Type II diabetes after being hospitalized for pneumonia.[13] By 2001, the record shows that Mr. Nugent suffered more complications from diabetes, a result of irregular insulin treatment, heavy smoking, and excessive drinking, that then resulted in hospitalization for four days in June of 2001.[14] After closing his bar in Wisconsin, Mr. Nugent then moved to Louisiana to work as a home inspector for the next year and one half.[15] By October 3, 2004, Mr. Nugent was hospitalized and treated for complaints of chest pains and other complications caused by hypertension and diabetes at the Louisiana State University Medical Center, Shreveport University Hospital.[16] Mr. Nugent did not return to work and eventually moved back to Illinois to live with his sister, Cheryl Lipsay. This is where he remains and she helps him to keep up with his prescribed treatment and provides him with a place to live.[17]

## A. Medical Treatment in Minnesota

Mr. Nugent's first medical records date from June 16 through June 20, 2001,[18] when he was hospitalized for acute diabetic ketoacidosis, a life threatening condition caused by inadequate insulin.[19] He was treated at St. Mary's Medical Center ("St. Mary's") in Duluth, Minnesota by Mark J. Plachta, M.D.,who noted that Mr. Nugent complained of blurry vision, shortness of breath, chest pain, nausea and trouble eating.[20] Dr. Plachta concluded that  Mr. Nugent's condition was caused

---

[12]R. 115-16.
[13]R. 270.
[14]R. 217.
[15]R. 336.
[16]R. 138.
[17]R. 353.
[18]R. 217-259.
[19]Attorneys Medical Deskbook § 24:27 (4th).
[20]R. 219-20.

by a failure to take insulin as prescribed.[21] Mr. Nugent indicated that his blood glucose meter was not working at the time[22] and he was given insulin therapy and was referred to the Diabetes Center at St. Mary's.[23] Dr. Plachta prescribed Gemfibrozil (used to control lipids in treating coronary artery disease)[24] and mandatory Humulin doses (insulin to control blood sugar levels)[25] in the morning and at bedtime in addition to varying Humulin doses based on Mr. Nugent's blood sugar.[26] Mr. Nugent was counseled about managing his diet,[27] and was also diagnosed with pancreatitis.[28] Dr. Plachta noted, "[c]hronic alcohol abuse– will address this hospitalization,"[29] but aside from an abdominal ultrasound,[30] the record does not indicate a course of treatment.

Mr. Nugent was again seen in the emergency room at St. Mary's on July 24 and July 25, 2001, this time by several doctors.[31] The first doctor, Jeffery H. Rayl, M.D., noted that Mr. Nugent complained of chest pain and shortness of breath for the previous two months and that his "episodes" last for about twenty minutes.[32] Mr. Nugent reported that his legs were increasingly numb, he had blurry vision, abdominal pain, nausea, and had vomited that morning.[33] Dr. Rayl concluded that Mr. Nugent was again suffering from acute diabetic ketoacidosis,[34] noting that "[t]he patient does not take his insulin regularly" and had not taken any of his prescribed medications for

---

[21]R. 220.
[22]R. 228.
[23]R. 218.
[24]Attorneys Medical Deskbook § 40:10 (4th).
[25]Attorneys Medical Deskbook § 40:11 (4th).
[26]R. 224, 229.
[27]R. 223, 229.
[28]R. 237.
[29]R. 220.
[30]R. 237, 240.
[31]R. 260-69.
[32]R. 261.
[33]*Id.*
[34]R. 262.

nearly a year.[35] The medications included: Amaryl (used with diet and exercise to control Type 2 diabetes)[36]; Actos (used in conjunction with insulin and diet and exercise to control Type 2 diabetes)[37], and Zocor (used to lower lipids for treating coronary artery disease).[38] Dr. Rayl also treated Mr. Nugent with nitroglycerine and morphine.[39]

On the same day Mr. Nugent was then treated by Francis Wade B. Nelson, M.D., whose report was substantially similar.[40] She indicated that the vision blurriness had only lasted two days and that Mr. Nugent reported six episodes of chest pain the previous day, that felt dull and squeezing and lasted for ten to fifteen minutes at a time.[41] Additionally, she noted Mr. Nugent's complaint of left foot numbness for the past five years, and that it was spreading to the right heel and big toe.[42] She discussed Mr. Nugent's heart risk factors with him, gave him one inch nitropaste, and concluded that he "will be ruled out" for a heart attack and ischemia.[43]

During the same hospital stay, Mr. Nugent was also treated by Jeffrey L. Nelson, M.D., whose notes reflect that chest pain began about a week prior to this visit, during which time Mr. Nugent had four or five episodes, generally at night.[44] The notes reflect that sometimes he would get sharp pains that lasted only a few seconds.[45] Mr. Nugent reported recurring leg swelling but denied any pain.[46] He also reported pain in his feet, and headaches on the top of his head.[47] Dr. Nelson

---

[35]R. 261.
[36]Attorneys Medical Deskbook §40:4 (4th).
[37]Attorneys Medical Deskbook §40:4 (4th).
[38]Attorneys Medical Deskbook §38:2.10 (4th).
[39]R. 262.
[40]R. 263-64.
[41]R. 263.
[42]*Id.*
[43]R. 264.
[44]R. 265.
[45]*Id.*
[46]*Id.*
[47]*Id.*

noted that Mr. Nugent had successfully stopped consuming alcohol except for having three drinks about a week before the visit, and his vision was good at short distances but bad from farther away.[48] Dr. Nelson gave him nitropaste and aspirin in addition to H2 blockers for the vomiting.[49] He counseled Mr. Nugent to resume his insulin regimen and referred him to a diabetic nurse in addition to telling Mr. Nugent that it was imperative that he not drink at all.[50] Dr. Nelson thought that with respect to the foot pain, "part of it seems to be neuropathy," but was unsure if it was the onset of gout.[51] He then continued the prescription for Gemfibrizol for hyperlipidemia.[52]

The last doctor Mr. Nugent saw as a result of this emergency room visit was Andrew C. Chiu, M.D., who performed a treadmill test on Mr. Nugent.[53] The results of this test showed that Mr. Nugent reached seventy-seven percent of the target heart rate and exhibited seventy-two percent of the "age adjusted functional aerobic capacity" before he could no longer continue the test due to exhaustion.[54] Dr. Chiu concluded that Mr. Nugent did not have ischemia or angina and that the left ventricle of his heart functioned normally, but that there were other problems that suggested prior injuries to the wall of his heart.[55] He also stated that Mr. Nugent had below average exercise tolerance.[56]

The next set of medical records are from the Duluth Diabetes Center regarding visits on September 12, 2001, and October 22, 2001.[57] The first visit was a substantive appointment with

---

[48]*Id.*
[49]R. 266.
[50]*Id.*
[51]*Id.*
[52]*Id.*
[53]R. 267.
[54]*Id.*
[55]*Id.*
[56]*Id.*
[57]R. 269-78.

nurse practitioner, Janet K. Cismoski, FNP, CDE, and the second was merely a routine follow up.[58] Mr. Nugent reported fatigue and irritability lasting throughout the past three years, but did not complain of shortness of breath, chest pain, or abdominal pain.[59] He also told Ms. Cismoski that he was taking Niacin without his doctor's knowledge on a friend's recommendation.[60] Ms. Cismoski noted that Mr. Nugent's vision was blurry for about two years and that both of his feet had numbness and tingling on their left sides.[61] He also reported that his left knee, which he had injured three years prior, was painful and swollen.[62] Mr. Nugent had been checking his blood sugar four times each day, and Ms. Cismoski indicated the readings' average ranges.[63]

Ms. Cismoski and Mr. Nugent discussed his goals of continuing to regulate his blood sugar, lose weight, and modify his diet habits; Mr. Nugent then met with a dietician.[64] Ms. Cismoski told Mr. Nugent to stop taking Niacin, keep checking his blood sugar, and referred him to an opthamologist.[65] She also indicated that Mr. Nugent would start new insulin medications, Gargine and Humalog, and wanted to obtain a urine sample to test whether he had liver damage due to his diabetes.[66] Ms. Cismoski recommended thirty minutes of exercise and aspirin daily, in addition to dental, eye, and foot exams and various vaccines.[67]

## B. Medical Treatment in Louisiana

After experiencing increasing chest pain for the previous two months, Mr. Nugent went to

---

[58]R. 270.
[59]Id.
[60]Id.
[61]Id.
[62]Id.
[63]R. 271.
[64]R. 272.
[65]R. 272-73.
[66]Id.
[67]R. 273.

the Louisiana State University Health Sciences Center emergency room on October 3, 2004.[68] Mr. Nugent was admitted for suspected subendocardial infarction with symptoms of mid substernal chest pressure and pain with associated right arm aching pain.[69] After left heart catherization, he was treated with the insertion of coronary artery stents to relieve arterial blockage of 99% and 80%.[70] Mr. Nugent was released on October 6, 2004 after a successful recovery from the procedures.[71]

On February 18, 2005, Mr. Nugent was examined by a state physician for a disability determination by the State of Louisiana Department of Social Services, Office of Family Support.[72] The examining physician, G. Thomas Arbour, M.D., diagnosed Mr. Nugent with:(1) coronary artery disease; (2) diabetes mellitus; and (3) tobacco abuse.[73] Dr. Arbour noted that Mr. Nugent would be limited in performing tasks that required exertion but did state that he could perform physical activities that involved sitting, standing, handling objects, hearing, speaking and traveling.[74] Dr. Arbour concluded in his exam notes that Mr. Nugent's echocardiogram and systolic function were normal with no findings to suggest congestive heart failure and that with tobacco cessation, lifestyle modifications, and compliance with prescribed medications, his condition should improve.[75] On March 14, 2005, Barbara Nicholas, SSA II filled out a questionnaire to determine Mr. Nugent's residual functional capacity ("RFC").[76] RFC's are based upon an individual's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments and are used to determine if a claimant still has abilities to perform various jobs available within the

---

[68]R. 129.
[69]*Id.*
[70]R. 139.
[71]R. 129.
[72]R. 151.
[73]*Id.*
[74]R. 153.
[75]R. 153-54.
[76]R. 155-62.

economy.[77] Boxes checked off on the form for exertional limitations determined that Mr. Nugent could occasionally lift 20 pounds; frequently lift 10 pounds; sit, stand, or walk 6 hours in an 8 hour workday; and there were no limitations in pushing or pulling with upper or lower extremities.[78] There were no limitations established for Mr. Nugent for the categories of manipulation, visual, communication, or the environment, as in heat or cold.[79] Ms. Nicholas concluded that there was no significant difference between her findings and the findings submitted by Dr. Arbour.[80]

## C. Medical Treatment in Illinois

After moving back to Illinois to live with his sister, Mr. Nugent started diabetes treatment with Jose Trevino, M.D. In September 2005, Dr. Trevino ordered coronary testing based upon Mr. Nugent's medical history and family background.[81] On October 11, 2005, Mr. Nugent saw Vijay Shah, M.D., of Rush Copley Medical Center.[82] Dr. Shah conducted a number of tests including: left heart catherization, coronary angiogram, and coronary arteriography.[83] Dr. Shah made findings of significant calcification with stenosis at 40% and mild coronary artery disease.[84] Suggested treatment was a continuation of diabetic management, anti-lipid therapy and anti-platelet therapy.[85] Dr. Trevino then filled out an RFC covering the period of June 16, 2005 through March 29, 2006 in which he noted that he had treated Mr. Nugent monthly since June 16, 2005.[86] Within the RFC, Dr. Trevino also noted that Mr. Nugent experiences pain constantly; he is incapable of even low stress

---

[77]20 CFR 404.1520(e).
[78]R. 156.
[79]R. 157-59.
[80]R. 161.
[81]R. 183.
[82]R. 164-65.
[83]R. 164.
[84]*Id.*
[85]*Id.*.
[86]R. 174-77.

jobs; he can sit for 10 minutes before needing to get up; he can stand for 5 minutes before needing to sit; in an 8 hour workday Mr. Nugent must walk every 5 minutes for 10 minutes; he will need to take a break every 15 minutes to rest 2 to 3 hours lying down, before returning to work; he will need to keep his legs elevated to hip level for any prolonged sitting.[87] Dr. Trevino also determined that Mr. Nugent could occasionally lift less than 10 pounds, rarely lift 10 pounds and never lift 20 to 50 pounds.[88] Mr. Nugent was to avoid all exposure to extreme heat and cold, high humidity, wetness and cigarette smoke.[89] He was to also avoid even moderate exposure to perfume, solvents and cleaners, and fumes, odors, and gases.[90]

Almost one year later, in January 2007, Dr. Trevino again filled out an RFC for the Social Security Administration.[91] In this report, and after two years of monthly treatment, Dr. Trevino downgraded Mr. Nugent's prognosis from 'fair' to 'poor'.[92] Dr. Trevino noted that Mr. Nugent suffered from fatigue, rapid heartbeat and chest pain, swelling, muscle weakness, kidney problems, vascular disease/leg cramping, insulin shock/coma, nausea/vomiting, extremity pain and numbness, difficulty thinking/concentrating, dizziness/loss of balance, hyperglycemic attacks, blurry vision, and a blood sugar reading of 310 versus a normal reading of 100.[93] Within that RFC, Dr. Trevino determined that Mr. Nugent could sit, stand/walk less than two hours in an 8 hour workday and would need to take unscheduled breaks and need to shift positions every ten to fifteen minutes.[94]

**D. The January 17, 2007 Hearing**

---

[87]*Id.*
[88]*Id.*
[89]*Id.*
[90]*Id*.
[91]R. 174-77.
[92]*Id*.
[93]*Id*.
[94]*Id.*

On January 17, 2007, a hearing before an ALJ was held after the Commissioner initially and subsequently, upon reconsideration, denied Mr. Nugent's application for DIB. The hearing consisted of the testimony of Mr. Nugent, his sister Cheryl Lipsay, and medical expert, Carl Leigh, M.D. Upon questioning from the ALJ, Mr. Nugent testified that he had cut his smoking down to one and one half packs a day and drinks very rarely;[95] he drives without restrictions on his license but explained that his blurry vision comes and goes;[96] he has been taking insulin since 2001 which he buys without a prescription and injects himself;[97] he has taken Neurontin since the summer before the hearing;[98] he does not have medical insurance and had Medicaid for 90 days when he first moved back to Illinois and has had no other medical coverage. [99] Mr. Nugent also testified that he suffers from severe and painful headaches 3 to 4 days a week and must lay down and nap for one hour and one half and take increased amounts of aspirin before they go away;[100] he explained that his biggest disability is his shortness of breath along with his joints, aching hip, burning and numb toes, and his right hand is half numb and his left hand is fully numb.[101] He testified that because of the numbness in his toes and the burning feeling in the rest of his foot along with general soreness in his knees, the only way he is able to walk  involves a form of rocking within his shoes.[102] He testified that in driving to the hearing, he needed to stop every 15 to 20 minutes to get out and walk because of the pain he felt in his hips, knees, and feet.[103] He then testified that his  morning routine consists of taking his medications slowly,  over a three hour period to help minimize his bouts of vomiting, after

[95]R. 337, 340.
[96]R. 342.
[97]R. 338-39.
[98]R. 341-42.
[99]R. 340.
[100]R. 343.
[101]R. 344.
[102]R. 347.
[103]R. 348.

which he takes a nap.[104] He also explained that he is on a special diet that is high in proteins which is good for diabetes but is not beneficial for his heart condition.[105] Finally, he testified that during the day, he attempts to help his sister with cleaning the  dishes or making his bed and may pickup her kids from bowling and afterward takes a nap.[106]

Ms. Lipsay then testified that she is an owner of a mobile home park[107] and that she invited her brother to live with her so that she could take care of him.[108] She explained that she also suffers with Type II diabetes and she took care of her father who also suffered from diabetes, so she is familiar with a diabetic diet and she cooks all of Mr. Nugent's meals.[109] When her brother first came to live with her, she noticed that his short term memory was impaired and he had trouble finishing even easy chores without sitting, resting, or napping.[110] She testified that he has taken his medications regularly and that she helps to pay for them.[111] Finally, she testified that he has more bad days than good days.[112]

Dr. Leigh was the next witness and his role was as an impartial medical expert.[113] He testified that he had never physically examined Mr. Nugent but did review the evidence within the record.[114] Dr. Leigh was then allowed to question Mr. Nugent.[115] His first question was about the results of an MRI that Mr. Nugent had taken for his knees before June of the previous year.[116] Mr. Nugent

---

[104]R. 345.
[105]R. 351-52.
[106]R. 346.
[107]R. 353.
[108]R. 353.
[109]R. 353-54.
[110]R. 355.
[111]R. 358.
[112]R. 359.
[113]R. 360.
[114]*Id.*
[115]*Id.*
[116]R. 361.

testified that the examining physician did not find anything wrong with his knees as a result of the MRI.[117] Mr. Nugent added that he experiences soreness in both knees and could not explain why the doctor could not find anything wrong.[118] Dr. Leigh then asked if he injected his own insulin since it takes better eyesight than he claims to have to be able to read the syringe accurately.[119] Mr. Nugent explained that he is nearsighted, so seeing the syringe markings wouldn't necessarily be beyond his abilities.[120] Dr. Leigh then asked if Mr. Nugent had balance problems and whether he could walk unaided noting that he walked "spryly" when he got up to walk around.[121] Mr. Nugent answered that he does not use a cane and that he must get up to walk around after sitting for a while.[122] He explained that it takes up to five minutes for the soreness in his legs to dissipate before it feels good to be moving around.[123]

The ALJ then continued questioning Dr. Leigh, who testified that Mr. Nugent suffers from hypertension, coronary artery disease, and diabetes.[124] Dr. Leigh also noted that there is suspected retinopathy and two symptoms of diabetic neuropathy that are manifested as a loss of sensation in his feet and vomiting.[125] But Dr. Leigh noted that there is no objective evidence to support the following: the retinopathy, frequent nausea and vomiting, chronic knee pain, and symptoms of neuropathy in his hands and feet.[126]

Dr. Leigh then testified that Mr. Nugent does not present enough objective evidence to be

---

[117] *Id.*
[118] *Id.*
[119] R. 362.
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] R. 362-63.
[124] R. 363-64.
[125] R. 364.
[126] R. 364-65.

considered disabled under the listing for diabetic neuropathy, or the listing for cardiac impairments.[127] Dr. Leigh then explained that he came up with two different RFCs:, the first based on the onset date to May 31, 2006; the second from June 1, 2006 to the decision date.[128] The first RFC is a "light RFC" which would limit Mr. Nugent to frequently lifting and carrying 20 pounds; occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; standing/walking six out of an eight hour day; and sitting six hours out of an eight hour day.[129] The second RFC would include lift and carry restrictions that are the same as the first; standing and walking would be two hours out of an eight hour day; sitting would be six hours with a sit/stand option; he would be limited to occasional use of foot controls bilaterally; and he would have to avoid hazardous machinery in both RFCs.[130]

Dr. Leigh was then questioned by Mr. Nugent's attorney.[131] Dr. Leigh was asked whether Mr. Nugent's claims of vomiting and nausea, headaches, extremity pain and numbness, loss of manual dexterity, and the idea that he would have good and bad days as a result of his condition, were taken into consideration in determining his RFCs. He responded negatively because he did not have objective medical evidence to support these symptoms. However, Dr. Leigh also states that he thought these symptoms were possible and noted that they would be consistent with Mr. Nugent's condition.[132] Mr. Nugent's attorney continued:

> **Q:** Um-hum. Actually, the doctor says he has a loss of manual dexterity. Did you consider that at all in your residual functional capacity–
> **A:** No...No, because I don't deny that it, it probably exists, but I didn't see it objectively measured with any kind of, oh, light touch, or sharp touch, any kind of micro-filament

---

[127]R. 365-66.
[128]R. 366.
[129]*Id.*
[130]R. 367.
[131]R. 368.
[132]R. 369.

testing, anything like that.

**Q:** In other words, you're really judging his condition on the fact that the doctor didn't do a lot of testing to confirm his diagnosis?

**A:** Right.

**Q:** So are you feeling that that should be ordered, or that we should go along with what the doctor said?

**A:** I think that is up to the Judge to decide.

**ALJ:** Yeah, I think that's up to myself, also.

* * *

**ATTY:** Well, your Honor, you have the choice of following a non-treating so-called expert, or a doctor who is treating, and I think you always need to take the treating physician, unless they are blatantly wrong. And if he gives– he's, he's certainly consistent in his–the two residual functional capacity tests. He's consistent with the–what my client testified to. And it's your choice.

**ALJ:** I'm quite aware of what the (INAUDIBLE).[133]

## E. The ALJ's Opinion

The ALJ followed the required social security regulations that mandate an ALJ to conduct a five step evaluation when determining whether a plaintiff is disabled.[134] The ALJ must determine: (1) whether the claimant is working and whether the work is substantial gainful activity; (2) whether the claimant has any impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; (3) whether the claimant's impairment meets or equals any impairment listed in the social security regulations as precluding gainful activity; (4) whether the claimant's impairment prevents him from performing his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[135] An ALJ must also conduct an RFC determination between step three and step four should the ALJ give a negative answer at step three.[136] A finding of disability requires an

---

[133]R. 369, 373.
[134]*See* 20 C.F.R. § 404.1520(a).
[135]20 C.F.R. § 404.1520(b)-(g).
[136]20 C.F.R. § 404.1520(a)(4).

affirmative answer at either step three or step five while a negative answer at any step other than step three precludes a finding of disability.[137] The plaintiff has the burden of proof at all steps except step five where the Commissioner has the burden of proof.[138]

At each step the ALJ's findings were as follows: (1) Mr. Nugent has not engaged in substantial gainful activity since October 2, 2004;[139] (2) Mr. Nugent has the following severe impairments: post myocardial infarction and diabetes;[140] (3) Mr. Nugent does not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526);[141] (4) Mr. Nugent was able to perform his past relevant work from his alleged onset date of October 2, 2004 until May 31, 2006. But since May 31, 2006 the claimant was unable to perform any past relevant work;[142] ( 5) based on Mr. Nugent's age, education, work experience, and RFC, the ALJ determined that there were significant numbers of jobs in the national economy that he could perform.[143]

As a result, the ALJ determined that Mr. Nugent was not disabled as defined by the Social Security Act from the onset date of October 2, 2004 through the decision date of March 23, 2007.[144] The ALJ rejected the two RFC's submitted by Dr. Trevino due to a lack of testing and an absence of substantiation within the record.[145] The ALJ instead based his decision upon the testimony and RFC of Dr. Leigh. The ALJ determined, based upon Dr. Leigh's RFCs, that Mr. Nugent could

---

[137]20 C.F.R. § 404.1520(d), (g).
[138]*Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).
[139]R. 18.
[140]*Id.*
[141]*Id.*
[142]R. 19.
[143]R. 21.
[144]R. 16.
[145]R. 20.

perform past relevant work, with a RFC of slightly reduced light work between October 2, 2004 to May 31, 2006.[146] This included the ability to lift/carry 20 pounds occasionally and 10 pounds frequently and avoid hazards like working at unprotected heights and exposure to cold and humidity.[147] After the May 31, 2006 date, the ALJ determined that Mr. Nugent could not perform past relevant work but could perform light to sedentary work up to the decision date.[148] This RFC included the ability to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 2 hours out of 8-hour workday; sit for 6 hours in an 8 hour workday with a sit/stand option; occasional use of the right extremity for foot controls; and no work around hazardous machinery.[149]

The ALJ also determined that Mr. Nugent was not entirely credible in his testimony about the severity of his medical conditions noting that there was nothing in the record to substantiate claims of persistent nausea and vomiting.[150] The ALJ noted that there was no record of testing for manual dexterity or touch sensitivity (micro-filament tests), which the medical expert confirmed in his testimony at the January 17, 2007 hearing.[151]

STANDARD OF REVIEW

It is well settled that in reviewing an ALJ's decision, factual determinations are entitled to deference, while conclusions of law are reviewed *de novo*.[152] The court will uphold the ALJ's decision if it is supported by substantial evidence and is free from legal error.[153] Substantial evidence means, "such relevant evidence as a reasonable mind might accept as adequate to support

---

[146]*Id.*
[147]R. 19.
[148]R. 20.
[149]R. 19.
[150]R. 20
[151]R. 16.
[152] *Prochaska v. Barnhart,* 454 F. 3d 731, 734 (7th Cir. 2006).
[153] 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

a conclusion."[154] "The ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade."[155] While factual determinations are entitled to deference, this deference requires the ALJ to "articulate at some minimum level, her analysis of the evidence."[156] However, "this does not mean that we will simply rubber-stamp the Commissioner's decision without a critical review of the evidence."[157]

ANALYSIS

Mr. Nugent argues that the ALJ's decision must be reversed or remanded because: (1) the ALJ rejected the treating physician's two RFCs; (2) the ALJ was required to take the testimony of a vocational expert ("VE"); and, (3) the ALJ did not find plaintiff completely credible. The Commissioner argues that when a treating physician sets forth unexplained or extreme limitations, as the treating physician did in this case, the Seventh Circuit has determined that the physician may be attempting to help the patient obtain disability benefits.[158] The Commissioner then argues that the objective evidence does not support some of Mr. Nugent's claims such as nausea and vomiting and that there is no record of treatment for those claims.[159] Finally, the Commissioner argues that because the substantial evidence supports the ALJ's RFC determination that Mr. Nugent has the capacity to perform substantially all of the full range of work, the testimony of a VE was not warranted.

## A.  The Treating Physician's RFC Determination

The thrust of Mr. Nugent's argument is that the ALJ committed reversible error when he

---

[154] *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).
[155] *Berger,* 516 F.3d at 544.
[156] *Dixon v. Massanari*, 270 F.3d 1171,1176 (7th Cir. 2001).
[157] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).
[158] *See Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006).
[159] *See* 20 C.F.R. § 404.1529(c)(3)(v).

rejected the RFC assessment submitted by Dr. Trevino, which found Mr. Nugent disabled. Mr. Nugent argues it was error for the ALJ to instead adopt Dr. Leigh's assessment, a state employed physician, who did not even examine him. The Commissioner argues that an ALJ may discredit a medical opinion that is based on a claimant's subjective report of symptoms.[160] The Commissioner also argues that in appropriate circumstances, an ALJ may use the opinion of a medical expert over that of a treating physician.[161]

In determining a claimant's eligibility for DIB, the ALJ must review the entire record.[162] Additionally, the "treating physicians rule" directs the ALJ to give controlling weight to the medical opinion of a claimant's treating physician if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.[163] The rule is used to create a sliding scale upon which the ALJ can rely entirely upon the treating physician's RFC on one end of the scale or rely entirely upon the consulting physician on the other end.[164] The ALJ can also use a combination of evaluations to make the final determination of disability.[165] The ALJ should look at factors such as how many times the physician saw the patient and whether the physician is a specialist in treating the patients disabling condition(s).[166] Finally, the ALJ may consider evidence from non-examining doctors, "[w]hen treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial

---

[160]*White v. Barnhart,* 415 F.3d 654, 659 (7th Cir. 2005) ("As explained by the ALJ, Dr. Woldum's opinion was based on White's subjective complaints rather than accepted medical techniques, and White's complaints were not credible in light of the opinions of numerous physicians who examined him and found no objective evidence to support his claims of debilitating pain."); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)("And medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.")
[161]*White* at 659.
[162]*Kepple v. Massanari,* 286 F.3d 513, 516 (7th Cir. 2001).
[163]20 C.F.R. § 404.1527(d)(2).
[164] 20 C.F.R. § 404.1527
[165]*Id.*
[166] *Hofslien v. Barnhart* 439 F.3d 375 (7th Cir. 2006).

evidence supports that decision."[167]

In this case, the ALJ decided to disregard the two RFC's submitted by Dr. Trevino and instead relied upon an alternate RFC submitted by state physician, Dr. Leigh.[168] After examining Mr. Nugent's medical record, Dr. Leigh determined that Dr. Trevino lacked necessary information to accurately complete the RFC questionnaires used to determine Mr. Nugent's limitations.[169] Specifically, Dr. Leigh thought that there was not enough diagnostic testing to accurately make a claim as to the extent of Mr. Nugent's disabilities, concluding that Mr. Nugent was not disabled.[170] Based upon his observations at the hearing, Dr. Leigh bolstered his determination by questioning Mr. Nugent's credibility in regards to claims of diminished eyesight and numbness in his hands and feet.[171]

Dr. Leigh's RFCs and testimony at the hearing appear to be at odds with the substantial amount of evidence in the record that portrays Mr. Nugent with a consistent progression of deteriorating health. The record shows that Mr. Nugent has not worked since October 2, 2004.[172] There are records showing he went to the emergency room a number of times for a documented heart condition.[173] Medical records further show that he suffered a diabetic coma and is currently taking medication to control diabetes milletus.[174] The testimony at the hearing also makes clear that in the intervening years since his diabetic coma, Mr. Nugent did not consistently take medication to control his diabetes.[175] Through testimony at the hearing we know that Mr. Nugent lives with his

---

[167]*Dixon v. Massanari,* 270 F.3d 1171, 1178 (7th Cir. 2001)
[168]R. 26.
[169] R. 370.
[170] R. 16-22; 365-69.
[171] R. 361-62; 363-65; 368-73.
[172]R. 73
[173]R. 138, 139, 151, 260, 266.
[174]R. 217.
[175]R. 339.

sister, he cannot afford to go to the doctor, and that his sister has difficulty paying for the care he does receive.[176] He also testified that he is now experiencing loss of sensation in his feet, blurry eyesight, and an intermittent inability to eat without vomiting.[177]

The regulations clearly give an ALJ the ability to order further tests and examinations when the records before him do not present enough information to make an informed disability decision.[178] At the hearing, Mr. Nugent's attorney specifically asked if more tests should be ordered. This was after Dr. Leigh admitted that he had come to his conclusion (that Mr. Nugent was not disabled), because there was a lack of testing done by Mr. Nugent's primary care physician. Specifically, Dr. Leigh determined, and the ALJ accepted, that though he did not deny that Mr. Nugent's symptoms were possible, they simply were not objectively measurable.[179] Instead of ordering tests, the ALJ decided to base his decision on Dr. Leigh's diagnosis and RFCs, which were not based on a physical examination of Mr. Nugent, but were based solely upon an examination of Mr. Nugent's medical records and his short testimony at the hearing.[180] So, though he relied on Dr. Leigh, what is missing from the ALJ's analysis is any mention of Dr. Leigh's testimony where he essentially agreed that Mr. Nugent's symptoms were typical of his condition but were not supported by testing.

Because additional testing was not done, the typical result would be for this Court to remand the case for this purpose. That is, however, less helpful in this case. Mr. Nugent has, during the pendency of this appeal, been deemed disabled and awarded benefits. In looking at this appeal, then, we are confined to reverse the ALJ's decision and remand for an award of benefits.

---

[176]R. 375.
[177]R. 344-45.
[178]*See* 20 C.F.R. § 404.1517, 404.1519b.
[179]R. 369.
[180]R. 360.

## B.  Lack of Testimony by a Vocational Expert

In light of our above finding, we briefly address the argument that the ALJ should have consulted a VE. The main issue argued is that an ALJ must consult a VE if there is a finding of not disabled and there are non-exertional limitations that would affect job performance.[181] Mr. Nugent asserts that   courts have  consistently  stated  that where a   non-exertional  limitation  might substantially reduce a range  of work an individual can perform, the use of the "grids" (a matrix used to  determine  disability  based  on  age,  schooling,  and  previous  work  experience),[182]  would  be inappropriate  and  the  ALJ  must  consult  a  VE.[183]  The  Commissioner  argues  that  "absent substantiation" or where there is no evidence of testing to determine the extent of a non-exertional limitation, the evidence within the record supports the ALJ's decision not to use a VE.

In this case, Mr. Nugent argued that testimony at the hearing should have prompted the ALJ to order more testing, especially since Dr. Leigh agreed that Mr. Nugent's claims of headaches, vomiting, and numbness in his extremities would be consistent with his medical condition. Instead, the ALJ determined that because there was a  lack of objective medical substantiation, Mr. Nugent failed to prove his claims, and subsequently adopted Dr. Leigh's RFCs. Because the ALJ did not take the necessary next step of ordering tests to resolve the opposing RFCs, which  ultimately would have  helped  to  determine  whether  Mr. Nugent  was  disabled,  there  was  no  showing  of  a  non-exertional limitation, prompting the use of a VE. In this case, it becomes a circular argument: there was no showing of non-exertional limitations, so no VE was consulted; but had there been more testing there may have been substantiation, and then, of course, a VE would have been required.

---

[181]20 C.F.R. Part 404 Subpart P Appx 1 S 200.00 (c)(e).
[182]20 C.F.R. 404 Subpart P.
[183]*Zurawski v. Halter,* 245 F.3d 881.

Either way, our ruling is the same. We find that more testing was necessary, so whether or not there should have been testimony from a VE is mooted.

## C. The ALJ's Credibility Determination

Finally, Mr. Nugent contends that the ALJ erred in his finding that he was not entirely credible. Mr. Nugent argues that the ALJ must actively discuss and reason with the claimant on areas of testimony where he is concerned with credibility, especially where physical assessment could reasonably be expected to produce the symptoms.[184] As such, the ALJ is required to explain, in his opinion, inconsistencies.[185] Finally, Mr. Nugent argues that the ALJ cannot just ignore a claimant's testimony.[186] The Commissioner argues that in assessing credibility, the ALJ may consider both treatment or a lack of treatment in forming an opinion of a claimant's medical conditions and claims. [187]

An ALJ's credibility findings will be affirmed unless they are patently wrong.[188] When determining credibility, the ALJ must consider the entire case record, including claimant's statements as well as the opinions of treating or examining physicians and other persons.[189] According to Social Security Ruling 96-7p, the ALJ's credibility determination "must contain specific reasons for the findings on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[190] Moreover,

---

[184]*Zurawski* at 870-872; *Castrejon* at 1058.
[185]*Id.*
[186]*Hill v. Astrue*, 245 F.3d 881 (7th Cir. 2008).
[187]20 C.F.R. 404.1529(c)(3)(v).
[188] *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) (*citing Pope v. Shalala*, 998 F.2d 478, 487 (7th Cir. 1993)).
[189] SSR 96-7p.
[190] *Id.*

the ALJ may not ignore the claimant's statements regarding pain and other symptoms or disregard them merely because they are not substantiated by subjective medical evidence.[191]

Here, the ALJ stated in his opinion that he found Mr. Nugent's testimony not entirely credible, specifically citing to Mr. Nugent's testimony describing his non-exertional limitations, including nausea and vomiting, that are not included in the medical record.[192] The ALJ also states that the claimant's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.[193] But, again, the ALJ rejected the RFCs of Dr. Trevino because there was not enough testing to substantiate whether or not Mr. Nugent really had those symptoms, such as nausea and vomiting (that Dr. Leigh agreed would follow from Mr. Nugent's diabetes and heart condition). We have already found that the ALJ should have ordered additional tests. The results of those tests would, or could have, affected the ALJ's credibility determination.

## CONCLUSION

It is clear from the record that Mr. Nugent suffers from debilitating medical conditions and the ALJ needed to more fully develop the record to get an accurate snapshot of whether Mr. Nugent was disabled. The ALJ was tasked with looking at all lines of evidence presented, and there were opposing RFCs that found Mr. Nugent either severely disabled or alternatively, not disabled. As the record stands, the substantial evidence does not support the ALJ's opinion. We determine that due to the lack of medical support, which the ALJ noted, further testing is required. Soon after this decision denying benefits, however, Mr. Nugent was, in fact, awarded disability benefits. Because Mr. Nugent has now been determined disabled, further testing would only confirm this fact. With

---

[191] *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (*citing Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)).
[192] R. 20.
[193] *Id.*

this in mind, we are reluctant to remand solely to allow further testing, as that is an assured finding of disability. We, therefore, reverse the decision of the ALJ to deny benefits and remand the case to the Commissioner for an award of benefits consistent with this opinion.[194] Accordingly, this Court grants Mr. Nugent's Motion for Summary Judgment [dkt. 21] and denies the Commissioner's Motion for Summary Judgment [dkt. 28].

**IT IS SO ORDERED.**

**ENTERED: October 14, 2009**

**Susan E. Cox**

**UNITED STATES MAGISTRATE JUDGE**

---

[194] 42 U.S.C.A. § 405.